UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

CYNTHIA SMITH                           )
(Social Security No. XXX-XX-6975),      )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )         4:08-cv-168-RLY-WGH
                                        )
MICHAEL J. ASTRUE, Commissioner of      )
Social Security Administration,         )
                                        )
                    Defendant.          )

**MEMORANDUM DECISION AND ORDER**

**I.  Statement of the Case**

Plaintiff, Cynthia Smith, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on January 19, 2006, alleging disability since August 18, 2005.  (R. 18, 52-54).  The agency denied Plaintiff's application both initially and on reconsideration.  (R. 41-42, 45-47).  Plaintiff appeared and testified at a hearing before Administrative Law Judge D. Lyndell Pickett ("ALJ") on October 16, 2007.  (R. 412-33).

1

Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 412). On November 30, 2007, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past relevant work as a teacher. (R. 18-24). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 5-7). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on October 9, 2008, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on September 11, 1954, Plaintiff was 53 years old at the time of the ALJ's decision, with a college education. (R. 24, 52, 89). Her past relevant work experience included a career as a teacher. (R. 89). She last worked as a teacher on August 18, 2005, which was one school year after she sustained what was described as a "possible transient ischemic attack" on June 20, 2004. (R. 166).

### B.  Medical Evidence

#### 1.  Plaintiff's Impairments

On June 20, 2004, Plaintiff was admitted through the Emergency Room at Floyd Memorial Hospital with slurred speech, headaches, a gait disturbance, and vision problems. (R. 149-50). A CT scan of the head on the same date revealed a small area of decreased density in the white matter of the left frontal lobe, suggestive of "an area of

2

encephalomalacia, possibly from an old infarct or other insult." (R. 157). Plaintiff also underwent an MRI of the brain on June 22, 2004 (R. 155-56) which showed "an unusual appearance of the left frontal lobe with what looks like a small cavitary area with some minimal enhancement along the posterior wall." (R. 156). Also of note were "nonspecific white matter changes involving both cerebral hemispheres," which were suspected as "probably a manifestation of small vessel ischemic disease/gliosis." (R. 156).

Neurologist Akif Hasan, M.D., evaluated Plaintiff on June 22, 2004, and provided the following impression:

> The patient is a 49-year-old lady who was recently diagnosed with hypertension, who developed gait disturbance, visual problems and slurring of speech. The neurologic examination is essentially nonfocal. The MRI of the brain also did not reveal any acute stroke. The clinical features may be secondary to the side effect of the trazodone; however, transient ischemic attack is also an important diagnostic consideration. The patient also had some features of sleep apnea.

(R. 154). The recommendation by Dr. Hasan was to discontinue Trazodone and consult with an ophthalmologist, as well as a sleep specialist. (R. 154). Upon discharge from Floyd Memorial Hospital on June 22, Plaintiff's final diagnosis was: (1) transient ischemic attack versus side effect from medication, specifically trazodone; (2) history of hypertension; and (3) possible small vessel disease of the central nervous system. (R. 150).

On September 30, 2004, Plaintiff was seen in follow-up with Dr. Hasan, who had seen her approximately three months earlier while a patient at Floyd Memorial Hospital.

3

(R. 305-08).  The numbness in her face had almost resolved.  (R. 305).  She occasionally noticed numbness in her right hand and right foot.  She had an essentially normal exam. (R. 306-07).  Dr. Hasan felt her symptoms might be a manifestation of atypical migraine headaches.  (R. 308).

At Plaintiff's visit with Dr. Hasan on August 22, 2005, she noticed that her numbness occurred with fatigue.  (R. 301-04).  Her balance and gait were also affected by fatigue and resolved with rest.  She had also noticed blurriness of vision.  Sometimes the tips of her fingers were also involved with the numbness of the face, and she had lightheadedness.  (R. 301).  A neurologic exam of her fifth cranial nerve showed decreased pinprick in right V1 distribution and light touch intact and decreased temperature in right V3 distribution.  She also had difficulty walking tandem.  (R. 303). Diagnostic considerations included central demyelinating disease.  Dr. Hasan felt that it would be worthwhile to consider evoked potential studies and a repeat MRI of the brain. She was referred to Kerri Remmel, M.D., of the University of Louisville Department of Neurology.  Plaintiff was to be off work one month, and he would see her again at that time.  (R. 304).

On September 6, 2005, Dr. Remmel examined Plaintiff because of headaches and dizziness.  (R. 176-78A).  Plaintiff reported a new spell of right sided facial numbness, blurred vision, dizziness with staggering, numbness in the bilateral lower extremities and upper extremity digits, with cognitive changes that were followed by sleeping the rest of the day.  She had been having headaches for the last two weeks on the right side, and had

4

not been driving due to her problems.  (R. 176).  Dr. Remmel noted that the June 2004 MRI of the brain showed a left frontal lobe small cavitary area, nonspecific white matter changes in the cerebral hemispheres, and "possible" small vessel ischemic disease.  (R. 177).  A September 2004 MRI of the brain was stable compared to the June 2004 MRI scan that showed "possible" small vessel ischemic disease, bilaterally, and a 1.5 cm area of abnormal signal in the left frontal lobe, and no mass effect or hemorrhage.  (R. 177). Plaintiff's neurological exam was normal, and Dr. Remmel wanted to follow up with an electroencephalogram ("EEG") of the brain and obtain additional records before calling the patient to discuss.  (R. 178-78A).  A September 6, 2005 EEG was normal.  (R. 179).

Dr. Hasan examined Plaintiff on September 22, 2005, because of numbness of the right side of her face.  (R. 297-300).  Plaintiff was oriented, her speech was spontaneous, and her memory, concentration, and attention span were intact.  (R. 299).  She continued to have intermittent numbness of the right side of the face with balance difficulties.  He referred her to be seen by the Department of Neurology at the University of Louisville. (R. 300).

Plaintiff presented to the University of Louisville Hospital on October 4, 2005, for additional workup of intractable seizures.  (R. 180-88).  At this visit, Pradeep Modur, M.D., indicated that Plaintiff experienced staggering, blurred vision, slurred speech, and hypertension during her first episode in 2004.  And, extreme fatigue and dizziness had become more severe in the last two to three months.  (R. 182).  Dr. Modur noted that, in 2004, Plaintiff was having approximately two seizure spells a week.  (R. 183).  The spells

were continuous until sleep ensued and would occur with physical activity or at the end of

the day.  Her vision would become blurry on the right side and her right face would

become numb.  (R. 183).

An MRI of Plaintiff's brain was taken on October 5, 2005, stating the following:

> There are focal areas of encephalomalacia at the base of the left frontal lobe
> and, a much smaller region, at the base of the right frontal lobe.  In addition,
> a left sided contiguous lesion is seen involving the left aspect of the genu of
> the corpus callosum . . . .  The pattern of enhancement is quite unusual.
> Although neoplasm or inflammation would be a consideration in the
> absence of the history of subacute ischemia or trauma, it may be an unusual
> type of gliosis, vascular malformation, and/or post ischemic change,
> perhaps with some blood products.
>
> Multiple focal areas of increased signal is seen on T2 and FLAIR on the
> deep white matter bilaterally, most likely representing small vessel disease
> given the history of past stroke.  Demyelination would also be considered
> . . . .

(R. 189).  The overall impression of the MRI was:  (1) encephalomalacia (softening of

brain tissue, usually caused by vascular insufficiency or degenerative changes), left

greater than right frontal lobe; (2) lesion in the left aspect to the genu of the corpus

callosum; (3) small vessel disease, and (4) artifact, left cerebellum.  (R. 189-90).  An

October 5 magnetic resonance angiography of the brain was normal.  (R. 191).

On October 12, 2005, Plaintiff was seen by John J. Guarnaschelli, M.D., a

neurosurgeon.  (R. 199-201).  Dr. Guarnaschelli indicated that the lesion in Plaintiff's

corpus callosum was consistent with a cavernous hemangioma.  (R. 200).  Treatment

options included:  (a) a "wait and watch" approach; (b) stereotactic radiotherapy; and (c)

open biopsy and/or surgical removal.  The doctor favored the "wait and watch" approach.

6

(R. 200).  Another issue discussed was that of longstanding complaints for headaches and other systemic complaints.  His explanation for these were the multiple lesions observed and whether or not these constituted a demyelinating process or ischemic vascular disease.  (R. 200).

Plaintiff was seen on October 7, 2005, by Todd Vitaz, M.D., because of numbness and tingling in her face and headaches.  (R. 214-16).  Plaintiff was alert and oriented.  (R. 214).  Plaintiff's speech and language were normal, her memory was appropriate, her concentration and attention span were normal, and her fund of knowledge was normal.  (R. 215).  Dr. Vitaz ruled out tumor and suggested that her symptoms might be low grade neoplasm with a small amount of malignant degeneration.  He also suggested that she might have had an old hemorrhage and the enhancement pattern on the MRI could possibly be consistent with a small Arteriovenous Malformation ("AVM").  (R. 215).

Dr. Vitaz saw Plaintiff again on October 14, 2005.  (R. 212-13).  Plaintiff was having some mild numbness and tingling in her face, with a small amount of double vision and complaints of significant fatigue.  Plaintiff denied any significant headaches.  (R. 212).  She presented with a repeat MRI that showed a small amount of enhancement in the left frontal lobe.  Dr. Vitaz's plan was to obtain an angiogram as the enhancement could possibly represent a small occult AVM.  (R. 212).

Plaintiff underwent an MRI of the brain on November 15, 2005, and the results showed the same abnormal findings as in a previous MRI.  (R. 219-20).

Plaintiff underwent cerebral and cervicocerebral arch arteriograms on November

29, 2005.  (R. 202-03).  The findings showed no definite vascular malformation or aneurysms, and patent vessels forming the anterior and posterior circulation of the brain. (R. 203).

Plaintiff visited Dr. Vitaz on December 7, 2005.  (R. 208-10).  Dr. Vitaz listed a range of symptoms including fatigue, balance problems, swelling in the feet, indigestion, memory problems, disorientation, difficulty with speech, inability to concentrate, blurred vision, facial weakness and numbness.  Dr. Vitaz's interpretation of the recent MRI was as follows:

> MRI done recently compared to her older MRI shows an area of encephalomalacia in the left frontal region with some mild enhancement near the corpus callosum.  This does not seem to have significantly changed, and I think that this may simply be consistent with an area of a prior hemorrhage and possible venous or small occult arterial venous abnormality.  She may have had a hemorrhage in this region that has subsequently resolved itself.  I think it is less likely that this represents some type of neoplastic process.

(R. 209-10).  Her current symptoms were stable and not thought to be related to imaging abnormalities.  (R. 210).

Dr. Hasan saw Plaintiff on December 16, 2005.  (R. 293-96).  Plaintiff's problems included hypertension and brachia plexitis and the numbness she was experiencing on the right side of her face.  (R. 293).  Plaintiff was oriented, her speech was spontaneous, and her memory, concentration, and attention span were intact.  (R. 295).  Plaintiff continued to have numbness and balance difficulties, and Dr. Hasan chose to start her on Neurontin and Elavil.  (R. 296).

8

On March 2, 2006, Dr. Hasan ordered another MRI to be taken at Floyd Memorial Hospital.  (R. 322-23).  There appeared to be an area of encephalomalacia within the medial aspect of the left frontal lobe.  Positioned between the area of encephalomalacia and the left aspect of the genu of the corpus callosum was a faint area of contrast enhancement.  The radiologist was uncertain whether these findings were secondary to known neoplasm or perhaps secondary to prior therapy.  (R. 322).  Both findings had remained stable compared to the prior study.  (R. 323).

Plaintiff appeared in follow-up with Dr. Hasan on March 6, 2006.  (R. 288-92). She reported that she had fatigue and snored at night.  (R. 288).  Plaintiff had hypertension and brachial plexitis, and had numbness on the right side of her face.  (R. 288).  Plaintiff was oriented, her speech was spontaneous, and her memory, concentration, and attention span were intact.  (R. 291).  She was essentially unchanged; the MRI of the brain showed no change.  (R. 292).

On April 5, 2006, Dr. Hasan wrote a letter about Plaintiff's condition.  (R. 353). Dr. Hasan stated Plaintiff had hypertension, history of brachial plexus, sensory paresthesias, and fatigue, and that some of the features were suggestive of central demyelinating illness.  He opined that she should be off work because of her medical condition.  (R. 353).

Dr. Hasan saw Plaintiff on August 1, 2006, for follow-up for numbness on the right side of her face.  (R. 284-87).  Plaintiff reported balance problems and fatigue.  (R. 284).  Plaintiff was oriented, her speech was spontaneous, and her memory,

concentration, and attention span were intact.  (R. 286).  Dr. Hasan noted that Plaintiff's
condition worsened, because even though her neuro-exam was unchanged, she
complained of extreme fatigue, balance problems, and weakness.  (R. 287).  Dr. Hasan
wanted to obtain an MRI and evaluate any change in lesions, and planned to follow up in
two to three months.  (R. 287).

An MRI of the brain performed on August 3, 2006, at Floyd Memorial Hospital
showed no change from the March 2006 MRI findings.  (R. 320).  Again was noted the
two cm area of encephalomalacia with a small area of enhancement in the posterior aspect
of this near the frontal horn of the left lateral ventricle in the medial aspect of the left
frontal lobe.  The impression also stated that it was unclear, as before, whether this was
related to prior therapy.  (R. 320).

Plaintiff visited Dr. Hasan on November 28, 2006.  (R. 358-61).  She continued to
have sensory paresthesias of the right side of the face, excessive fatigue, gait disturbance,
and weakness on the right side.  (R. 358).  Plaintiff was oriented, her speech was
spontaneous, and her memory, concentration, and attention span were intact.  (R. 360).
Dr. Hasan opined that her symptoms may be secondary to white matter disease but that
she did not meet the criteria for a diagnosis of multiple sclerosis.  (R. 361).

At a March 13, 2007, appointment with Howard Pope, M.D., Plaintiff complained
of having weak spells from four to six o'clock daily.  She had retired after 30 years.  She
stated that she had about a three-hour window during the day where she was OK, but then
she fatigues out.  On exam, Dr. Pope noticed a fine tremor in her outstretched hands.  (R.

10

388-89).

Plaintiff was seen by Dr. Hasan again on March 27, 2007.  (R. 354-57).  She was being evaluated for cavernous hemangioma by a neurosurgeon.  (R. 354).  She had been having fatigue and gait disturbances, as well as headaches. The headaches were pressure-like and throbbing in nature.  During these, she has gait disturbances and noticed weakness on the right side.  (R. 354).  On exam, she had difficulty in walking tandem, heels, and toes.  (R. 356).  Plaintiff had clinical features suggestive of "mixed headache syndrome," as well as central demyelinating illness.  He increased her Amantadine and asked to see her again in two to three months.  (R. 357).

Dr. Hasan saw Plaintiff on June 26, 2007, in follow-up for numbness on the right side of the face and headaches.  (R. 349-52).  She was more exhausted and fatigued in warm weather and usually stayed indoors.  She had continued to take Neurontin and Amantadine and had continued difficulty in walking.  (R. 349).  Plaintiff was oriented, her speech was spontaneous, and her memory, concentration, and attention span were intact.  (R. 351).  Dr. Hasan noted that she has some features suggestive of central demyelinating illness.  He was to arrange for a lumbar puncture at Floyd Memorial Hospital.  (R. 352).

On October 11, 2007, Dr. Hasan completed a "Medical Statement Regarding Headaches."  (R. 367).  Dr. Hasan opined that Plaintiff had migraine and muscle tension headaches more than once a week, and that they lasted more than 24 hours.  The headaches resulted in nausea, vomiting, and irritability.  Dr. Hasan opined that, while she

was having a headache, Plaintiff would not be able to work.  (R. 367).

## 2.  State Agency Review

Plaintiff's Psychiatric Review Technique was performed on June 19, 2006, by Dr. Pressner.  There were no mental defects.  (R. 262-75).  The evaluation relied on records from Dr. Freudenberger that revealed no deficits in memory.  (R. 274).

On June 20, 2006, J. Valentine Corcoran from the Indiana Department of Disability Determination completed a Physical Residual Functional Capacity Assessment. (R. 276-83).  He concluded that Plaintiff should be able to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push/pull were unlimited.  (R. 277).  She could never climb ladders, ropes, or scaffolds, and should avoid hazardous machinery and heights.  (R. 278, 280).  There was no reference to headache frequency or fatigue.  (R. 276-83).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and

decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court

may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that

of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus,

even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v.

Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

she suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five-step test the ALJ is to perform in order to determine whether a claimant is disabled.

*See* 20 C.F.R. § 404.1520.  The ALJ must consider whether the claimant:  (1) is presently

employed; (2) has a severe impairment or combination of impairments; (3) has an

impairment that meets or equals an impairment listed in the regulations as being so severe

as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant

work; and (5) is unable to perform any other work existing in significant numbers in the

national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four,

and only after Plaintiff has reached step five does the burden shift to the Commissioner.

13

*Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of the ALJ's decision.  Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 20).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are classified as severe:  transient ischemic attack and associated headaches and fatigue; hypertension.  (R. 20).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 21).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 22).  Consequently, the ALJ concluded that Plaintiff retained the RFC for light work except she is limited to:  no climbing of ladders, ropes, or scaffolds; and she cannot be exposed to hazards such as machinery or heights.  (R. 21).  The ALJ opined that Plaintiff retained the RFC to perform her past work as a teacher.  (R. 23).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 23).

## VI.  Issues

Plaintiff has essentially raised two issues.  The court notes a third issue.  The issues are as follows:

1.  Whether the ALJ failed to give proper weight to Dr. Hasan's opinions.

2.  Whether the medical record is incomplete.

14

3.  Whether remand is necessary for consideration of new evidence.

**Issue 1:  Whether the ALJ failed to give proper weight to Dr. Hasan's opinions.**

Plaintiff first argues that the ALJ erred by rejecting the opinions of Dr. Hasan.

Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v.*

*Apfel,* 227 F.3d at 870.  However, an ALJ may reject the opinion of a treating physician if

it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or

is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d

1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for

how the opinions of treating and nontreating sources are to be evaluated and explains as

follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we
> will evaluate every medical opinion we receive.  Unless we give a treating
> source's opinion controlling weight under paragraph (d)(2) of this section,
> we consider all of the following factors in deciding the weight we give to
> any medical opinion.
>
> (1)  *Examining relationship.*  Generally, we give more
> weight to the opinion of a source who has examined you than to the
> opinion of a source who has not examined you.
>
> (2)  *Treatment relationship.*  Generally, we give more weight
> to opinions from your treating sources, since these sources are likely
> to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a
> unique perspective to the medical evidence that cannot be obtained
> from the objective medical findings alone or from reports of
> individual examinations, such as consultative examinations or brief
> hospitalizations.  If we find that a treating source's opinion on the
> issue(s) of the nature and severity of your impairment(s) is well-
> supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other

substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their

16

opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f)  *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the

17

> requirements for any impairment listed in appendix 1 to this
> subpart, and your residual functional capacity.  These administrative
> findings of fact are based on the evidence in your case record but
> are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

Plaintiff specifically argues that the ALJ committed error when he failed to give controlling weight to an October 11, 2007 "Medical Statement Regarding Headaches" in which Dr. Hasan opined that Plaintiff had headaches more than once a week, that they lasted more than 24 hours, that the headaches resulted in nausea, vomiting, and irritability, and that, while she was having a headache, Plaintiff would not be able to work.  (R. 367).  The ALJ did not commit error by failing to give this opinion controlling weight.  Dr. Hasan's opinions are contradicted by his own medical evaluations and those of other examining physicians who did not indicate any debilitating headaches in their records from November 2005 to March 2007.[1]  Additionally, Dr. Hasan routinely indicated that, upon examination, Plaintiff had normal neurological findings.  (R. 286, 291, 351, 360).  Finally, while Plaintiff did have abnormal MRI results, all subsequent MRI exams revealed Plaintiff's condition to be stable.  And, Plaintiff had continued to work for one year after abnormal MRI results had first appeared.  Hence, the ALJs decision to deny controlling weight to Dr. Hasan's October 11, 2007 opinions concerning Plaintiff's headaches is supported by substantial evidence.

---

[1]While the record is replete with Plaintiff complaining of "numbness" or "blurred vision" or feeling bad all over, the records do not describe complaints of debilitating headaches with nausea or vomiting.

**Issue 2:  Whether the medical record is incomplete.**

Next, Plaintiff finds fault in the fact that an opinion from a state agency doctor, Dr. Pressner, references a mental exam from Dr. Freudenberger, but the record does not include Dr. Freudenberger's exam.  Dr. Pressner's evaluation has been available to Plaintiff since June 2006, and it appears that Plaintiff's first complaint that the record did not include Dr. Freudenberger's exam came when she filed her brief with the court on April 3, 2009.  Furthermore, the ALJ never referenced Dr. Pressner's opinion.[2]  Hence, it appears that this "missing" medical record had no influence on the ALJ's decision. Finally, Plaintiff has failed to demonstrate that the inclusion of this medical record from Dr. Freudenberger was favorable to her case.  The reference by Dr. Pressner to Dr. Freudenberger's exam reveals essentially normal memory testing.  The fact that an alleged exam by Dr. Freudenberger was not included in the record is harmless error.

**Issue 3:  Whether remand is necessary for consideration of new evidence.**

Finally, Plaintiff has cited evidence in her brief that was not presented to the ALJ, but, rather, was only provided to the Appeals Council after the ALJ's decision.  A federal court may not consider new evidence in reviewing the ALJ's decision.  *Rasmussen v. Astrue,* 2007 WL 3326524 at *4 (7th Cir. 2007).  However, the court may remand for an ALJ to consider additional evidence if such evidence is both new and material and if there has been shown good cause for the failure to incorporate the evidence into the record in a

---

[2]The ALJ does reference a "state agency medical expert" (R. 23), but this expert in Exhibit 18F is J. Valentine Corcoran (R. 283), not Dr. Pressner.

prior proceeding.  42 U.S.C. § 405(g); *Schmidt v. Barnhart,* 395 F.3d 737, 741-42 (7th Cir. 2005).  Evidence is considered "new" if it was not available or in existence at the time of the administrative proceeding.  *Schmidt*, 395 F.3d at 741-42.  The evidence is "material" if there is a reasonable probability that the ALJ would have reached a different conclusion had he considered the evidence, meaning that the evidence must be relevant to plaintiff's condition during the relevant time period under consideration by the ALJ.  *Id*.

In this case, Plaintiff has not explicitly argued in her brief for a remand for consideration of new evidence.  However, the court may not consider this evidence in reviewing the ALJ's decision.  The only action the court could possibly take is to issue a "sentence six" remand.  Here, such a remand is not warranted.  The only "new" evidence Plaintiff submitted consisted of two office visits from Dr. Hasan on December 20, 2007 (R. 408-11) and March 27, 2008 (R. 404-07).  These examinations by Dr. Hasan occurred after the ALJ's decision in November 2007; therefore, they do not relate to the relevant time period.

## VII.  Conclusion

The ALJ's failure to give controlling weight to the opinions of Dr. Hasan as to Plaintiff's disabling headaches is supported by substantial evidence.  Without those headaches, the extent of Plaintiff's claims of fatigue and facial numbness is subject to a credibility determination by the ALJ.  Plaintiff has not argued that the ALJ's credibility determination is patently wrong.  Although another ALJ could have concluded that these

conditions as described by Plaintiff herself were debilitating (particularly in light of Plaintiff's 30-year career as an educator), the ALJ was not compelled to do so.  The court is not at liberty to substitute its opinions on credibility for those of the ALJ, though this is a tempting case to do so.

The failure to include a mental exam from Dr. Freudenberger in the record does not warrant remand.  Finally, remand for consideration of new evidence is unwarranted. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 30th  day of March, 2010.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Larry J. Schad                                  Thomas E. Kieper
SCHAD & PALMER                        UNITED STATES ATTORNEY'S OFFICE
lschad@schadlaw.com                     tom.kieper@usdoj.gov

21